# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | | |
|---|---|---|
| TRACY MCKEVER and DANA J. BELVIY on behalf of Southeastern Freight Lines Retirement Savings Program, | ) ) ) ) | 3:24-6170-SAL |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | |
| SOUTHEASTERN FREIGHT LINES, INC. | ) ) | |
| *Defendant.* | ) | |

## CLASS ACTION COMPLAINT

1.     This action seeks to protect the retirement savings of several thousand Southeastern Freight Lines, Inc. ("Defendant") employees who are participants in the Southeastern Freight Lines Retirement Savings Program ("Plan").

3.     In addition, Defendant has a fiduciary duty to prudently select and monitor investments offered through the Plan. The Plan is eligible – given its massive size and economies of scale – for discounted pricing for investments included on the Plan's investment menu. Instead of taking advantage of favorable pricing, Defendant caused Plan participants to pay more for investments than what they were eligible for and far more than what they should have paid. During the relevant time period, Plan participants have paid more than $8,000,000 in imprudent and excessive investment related fees. These losses will also continue to accrue

unless this case moves forward.

4.      Tracy McKever and Dana Belviy (collectively, "Plaintiffs") bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from Defendant's breaches of fiduciary duty, and related ERISA violations.

## JURISDICTION AND VENUE

5.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.      This Judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

7.      The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

8.      As a fiduciary to the Plan, Defendant is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must

act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

9.      "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries…Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principle favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

10.      Defendant is responsible for selecting investments and hiring service providers for the Plan. These fiduciary decisions have the potential to dramatically affect the amount of money that plan participants can save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.*S. Dep't of Labor, A Look at 401(k) Plan Fees*, at 1-2 (Aug. 2013).

11.      That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the

retirement savings. *Id*.

12.     Accordingly, Defendant must engage in a rigorous process to control fees and ensure that Plan participants pay no more than a reasonable level of fees. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service, investments, and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

13.     The entities that and investments to retirement plans have a strong incentive to maximize their fees. Each dollar in fees paid from participants' retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce a plan's fees.

14.     Plan fiduciaries must be cognizant that self-interested third parties seek to maximize fees from plans, and fiduciaries may not simply accede to demands, or agree to quotes without negotiating or considering alternatives. To act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake.

## **THE PLAN**

15.     The Plan is a qualified retirement plan commonly called a 401(k) plan.

16.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

17.     Defendant is a statutory fiduciary to the Plan.

18.     Eligible current and former employees of Defendant are eligible to participate in the Plan. The Plan will provide or does provide the primary source of retirement income for many of Defendant's current and former employees.

19.     Defined contribution retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (<$1 billion).

20.     As of December 31, 2023, the Plan had $1,046,766,902 in assets and 10,046 participants with account balances.

21.     Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, Defendant imprudently invested plan assets in share classes for which an identical share class was available for a lower cost.

## THE PARTIES

22.     Plaintiff McKever is a former employee of Defendant and a current participant in the Plan. Plaintiff McKever is currently invested in the T. Rowe Price MidCap Growth Fund, which is an investment included on the Plan's menu of

investment options. The T. Rowe Price MidCap Growth Fund was offered by the Plan with an expense ratio of between 77 and 74 basis points at all relevant times. The identical investment is/was available at a cost of just 63 basis points.

23.     Plaintiff Belviy is a current participant in the Plan. Plaintiff Belviy has been invested in the Plan's T. Rowe Price Retirement Trust B 2035 for the entirety of the class period. The T. Rowe Price Retirement Trust B 2035 is included in the suite of Target Date Funds (TDFs) offered by the Plan, each correlated to the participant's projected retirement year.  The TDFs were offered with an expense ratio between 43 and 36 basis points.  The identical investment is/was available at a cost of 30 or less basis points.

24.     The T. Rowe Price Retirement Trust B TDFs were also designated as the Plan's Qualified Default Investment Alternative ("QDIA").   Thus, all contributions were, and are still automatically invested in the applicable T. Rowe Price Retirement Trust B TDF unless a participant has affirmatively chosen to invest in a different fund on the Plan's investment menu.

25.     Plaintiffs have statutory standing to bring this action because 29 U.S. §1132(a)(1) allows a plan participant to file a civil action which seeks relief on behalf of a plan. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and related ERISA violations. Plaintiffs and all Plan participants paid excessive and unreasonable investment fees. Plaintiff and all Plan

participants paid excessive and unreasonable administrative fees. Plaintiffs and all Plan participants suffered losses resulting from Defendant's self-dealing with Plan assets. Plaintiffs allege he and Plan participants suffered the same losses resulting from the ERISA violations committed by Defendant as set forth herein. All relief sought by the Plaintiffs is sought on behalf of the Plan.

26.     To establish Constitutional standing (or Article III standing), a plaintiff need only show a concrete and particularized injury flowing from Defendant's ERISA violations. Plaintiffs allege their individual accounts in the Plan suffered losses because their accounts were assessed excessive fees, which would not have been incurred had Defendant discharged its ERISA fiduciary duties to the Plan and ensured fees were reasonable. That money (millions of dollars) should have gone towards Plan participants' retirement; instead, it went elsewhere. Plaintiffs allege concrete and particularized injuries. Plaintiffs also have standing because they are seeking injunctive and equitable relief on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Southeastern Savings Plan, at any time between October 23, 2018, and the present (the "Class Period") who were invested in the T. Rowe Price MidCap Growth Fund or T. Rowe Price Target Date Funds.

28.     The members of the Class are so numerous that joinder is impractical. According to the Plan's annual Form 5500 Disclosure for the year ending 2023, filed with the U.S. Department of Labor, there were 10,046 Plan participants with account balances.  Discovery will prove thousands of Plan participants were invested in the imprudent investments, which in the aggregate typically comprise over 60% of the Plan's assets.

29.     Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendant's ERISA violations. Defendant treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's ERISA violations.

30.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendant is a fiduciary of the Plan;

B.     Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether Defendant failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of relief.

31.    Plaintiffs will fairly and adequately represent the Class. Plaintiffs have retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiffs have no interests antagonistic to those of other Class members. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this action as a class action.

32.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

33.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### *Defendant Breached Its Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Share Classes of the Same Funds*

34.     One of Defendant's responsibilities to the Plan is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 718-19 (2d Cir. 2013).

35.     Defendant failed to prudently monitor and select proper share classes of twenty-two (22) investments (almost every investment) on the Plan's investment menu. Investment companies offer pricing discounts to retirement plans. The discounts are offered because investment companies recognize that trillions of dollars are invested through retirement plans, and they want their investments to be offered by retirement plans. So, investment companies offer pricing discounts to retirement plans. All prudent fiduciaries of billion-dollar retirement plans know this. The discounts are typically referenced by what is known as "share classes." The

"retail" share class of an investment charges a higher price than a "retirement plan" share class. But in all other material aspects, the underlying investment is the same.

36.    Here, Defendant selected more expensive share classes than identical less expensive share classes of the same investments. Except for the extra fees, the share classes are/were identical.

37.    The Plan derived no value from the more expensive share classes.  Even if revenue sharing with the more expensive share classes was allegedly used to offset Plan expenses, Defendant was already causing the Plan to pay excessive compensation to the Plan's recordkeeper, T. Rowe Price.  No prudent fiduciary would "pay more" to offset the [inflated] cost for services for which it was already over-paying.

38.    The more costly share classes did not benefit Plan participants.  Rather, the costlier share classes harmed Plan participants by diminishing their returns on a compound basis.

39.    Defendant's selection of the T. Rowe Price Retirement Trust B TDFs as the Plan's QDIA was imprudent.  Essentially, Defendant caused the Plan to funnel participant investments into costlier funds when identical, less expensive funds were available.

40.    Plaintiff estimates that Defendant's imprudent choices relating to share classes resulted in nearly $8,000,000 in excessive fees paid by the Plan and its participants.

41.    Defendant recently discovered its error and replaced some of the more expensive share classes with less expensive, but identical, share classes of the same investments on the Plan's investment menu. Defendant's belated recognition that it was imprudent for Defendant to select more expensive share classes than what was available to the Plan corroborates the allegations in Plaintiff' Complaint.

42.    But Defendant still acted imprudently when replacing expensive share classes because Defendant failed to prudently select for the Plan the lowest price share classes. Indeed, in 2021 Defendant caused the Plan to switch the TDFs from share classes of investments offered at a cost of 43 basis points to share classes offered at a cost of 36 basis points. But at the time of the switch, the same investments were offered in a share class at a cost of just 30 basis points and are available for even less today.

43.    Had Defendant utilized a prudent process, such a determination would have been made earlier, saving Plan participants millions in wasted retirement assets. And when the switch in 2021 was made, Defendant would have switched to the lowest cost share classes.

44. A prudent fiduciary must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. If a fiduciary fails to select prudent investments or fails to remove an imprudent investment from a plan within a reasonable time, as Defendant has done here, a breach ERISA's fiduciary duties occur. *Hughes v. Nw. Univ*., 595 U.S. 170, 142 S. Ct. 737, 742 (2022).

45. Long before *Hughes*, the Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id*. at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

46. The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

47.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.") Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

48.    Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "imprudent," or if there is a "superior alternative investment" to any of the plan's holdings.

49.    As demonstrated by the chart below, Defendant failed to prudently monitor the Plan to determine whether the Plan was invested in the prudent share classes that were available to the Plan. Again, these investments are identical in every way except for their lower cost.

50.    Unlike a claim premised on an imprudent choice between two different mutual funds that perform differently over time, a claim premised on the selection of a more expensive share class of the same fund guarantees worse returns. *Forman v. TriHealth, Inc*., 40 F.4th 443, 451 (6th Cir. 2022).

51.    The two share classes will produce the same initial returns, but higher costs will erode gains and steepen any losses. As costs compound, the differential will grow each year.

52.    The Plan's menu of investments needlessly consisted of expensive fund share classes when lower-cost share classes for the same funds were readily available. To illustrate, the table below shows funds on the Plan's menu as of 2019 (which is representative of most of the relevant time period – even more expensive share classes were on the Plan's investment menu previously).

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Dodge & Cox Intl Stock Fund Class I | **.63%** | Dodge & Cox Intl Stock Fund Class X | **.57%** |
| T. Rowe Price Retire Balanced Fund Trust Class F | **.43%** | T. Rowe Price Retire Balance Trust Class E | **.30%** |
| T. Rowe Price Retirement 2005 Trust Class F | **.43%** | T. Rowe Price Retirement 2005 Trust Class E | **.30%** |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| T. Rowe Price Retirement 2010 Trust Class F | .43% | T. Rowe Price Retirement 2010 Trust Class E | .30% |
| T. Rowe Price Retirement 2015 Trust Class F | .43% | T. Rowe Price Retirement 2015 Trust Class E | .30% |
| T. Rowe Price Retirement 2020 Trust Class F | .43% | T. Rowe Price Retirement 2020 Trust Class E | .30% |
| T. Rowe Price Retirement 2025 Trust Class F | .43% | T. Rowe Price Retirement 2025 Trust Class E | .30% |
| T. Rowe Price Retirement 2030 Trust Class F | .43% | T. Rowe Price Retirement 2030 Trust Class E | .30% |
| T. Rowe Price Retirement 2035 Trust Class F | .43% | T. Rowe Price Retirement 2035 Trust Class E | .30% |
| T. Rowe Price Retirement 2040 Trust Class F | .43% | T. Rowe Price Retirement 2040 Trust Class E | .30% |
| T. Rowe Price Retirement 2045 Trust Class F | .43% | T. Rowe Price Retirement 2045 Trust Class E | .30% |
| T. Rowe Price Retirement 2050 Trust Class F | .43% | T. Rowe Price Retirement 2050 Trust Class E | .30% |
| T. Rowe Price Retirement 2055 Trust Class F | .43% | T. Rowe Price Retirement 2055 Trust Class E | .30% |
| T. Rowe Price Retirement 2060 Trust Class F | .43% | T. Rowe Price Retirement 2060 Trust Class E | .30% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| T. Rowe Price Retirement 2065 Trust Class F | **.43%** | T. Rowe Price Retirement 2065 Trust Class E | **.30%** |
| T. Rowe Price Small Cap Class A | **.89%** | T. Rowe Price Small Cap Class I | **.78%** |
| T. Rowe Price Spectrum Class A | **.89%** | T. Rowe Price Spectrum Class I | **.47%** |
| T. Rowe Price Value | **.80%** | T. Rowe Price Value Class I | **.58%** |
| T. Rowe Price Strat Balanced | **.86%** | T. Rowe Price Strat Balanced Class I | **.62%** |
| T. Rowe Price Strat Growth | **.88%** | T. Rowe Price Strat Growth Class I | **.64%** |
| T. Rowe Price Mid-Cap Growth | **.72%** | T. Rowe Price Mid-Cap Growth Class I | **.63%** |
| PIMCO All Asset Class I | **1.11%** | PIMCO All Asset Class I2 | **.33%** |

53.    In 2019, there was nearly $600,000,000 invested through the Plan in the above referenced imprudent funds. A twenty (20) basis point difference on $600,000,000 equals $1,200,000. These losses have needlessly been occurring every year due to Defendant's imprudence. And losses are increasing each year as Plan assets increase.

54.    In 2021, Defendant caused the Plan to switch to some lower priced share classes of the <u>same</u> investments, but still Defendant failed by not selecting for

the Plan the lowest priced share classes of the <u>same</u> investments. Defendant's switch to a lower priced share class in 2021, but not the lowest priced share class, is additional evidence Defendant breached its ERISA duty of prudence.

55.    As the table above illustrates, throughout the relevant period, Defendant should have known of the existence and availability of lower-cost share classes and should have promptly transferred the Plan's investments into the prudent share classes. However, Defendant failed to do so, instead waiting many years before making any changes – and then when Defendant finally did make changes, it still selected more expensive share classes than what are available to the Plan.

56.    Plaintiffs' claim that Defendant breached its duty of prudence by selecting more expensive share classes than what was available to the Plan is a claim nearly identical to one just recently addressed by the United State Supreme Court in *Hughes v. Nw. Univ.*, 595 U.S. 170, 142 S. Ct. 737, 742 (2022).

57.    Plan assets are being needlessly wasted and retirement savings frittered away. This is a classic breach of ERISA's fiduciary duty of prudence.

58.    A prudent fiduciary conducting an impartial review of the Plan's investments on a monthly, quarterly, or at least an annual basis, would have easily identified the prudent share classes available and transferred the Plan's investments in the above-referenced funds into lower-cost prudent shares at the earliest opportunity. Defendant failed to do so.

59.    There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services nor benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

60.    Plaintiffs are not arguing that Defendant had a duty to scour the market to find and offer a cheaper investment. Instead, Plaintiffs allege simply that lower cost investments with identical managers, investments styles, and meaningful constructs should have been considered by the Plan, particularly as it relates to the twenty-two (22) funds identified above.

## CLAIM FOR RELIEF
### _Breach of Fiduciary Duty of Prudence_

61.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

62.    As a fiduciary of the Plan, Defendant was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

63.    Defendant breached these fiduciary duties in multiple respects, as discussed throughout this Complaint. Defendant failed to monitor or control the excessive compensation paid to TRP.

64.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

65.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all Plan participants similarly invested, respectfully request that the Court:

1.    Find and declare that Defendant breached its fiduciary duties as described above;

2.     Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to

otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.      Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Certify the Class, appoint the Plaintiff as class representative, and appoint the undersigned as Class Counsel;

8.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

9.      Order the payment of interest to the extent it is allowed by law; and

10.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 23rd day of October 2024.

Respectfully submitted,

/s/ *Lauren Heath Carroway*
**MORGAN & MORGAN, P.A.**
Lauren Heath Carroway
SC Bar Number 13693
1544 Fording Island Road, Suite A
Hilton Head, South Carolina
(854) 222-6075
Email: lcarroway@forthepeople.com
Marc R. Edelman, Esq. (*Pro Hac Vice forthcoming*)
201 North Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: (813) 577-4722
Email: medelman@forthepeople.com


**WENZEL FENTON CABASSA, P.A.**
Luis A. Cabasa, Esq. (*Pro Hac Vice forthcoming* )
Brandon J. Hill, Esq. (*Pro Hac Vice forthcoming*)
Amanda E. Heystak, Esq. (*Pro Hac Vice forthcoming*)
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com


**MCKAY LAW, LLC**
Michael McKay, Esq. (*Pro Hac Vice forthcoming*)
5635 North Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us


*Attorneys for Plaintiff and the Class*